ORIGINAL

AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>RALPH ALLEN JACKSON JR.,<br>aka "Mac Wimp" | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**M 13 01747** |
|---|---|

Complaint for violation of Title 18, United States Code, Section 1591(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ANDREW J. WISTRICH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>June 18, 2013 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1591(a)]

Beginning on an unknown date, and continuing to on or about June 18, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant RALPH ALLEN JACKSON, JR., also known as "Mac Wimp," knowingly, in and affecting interstate commerce, recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim #1, knowing and in reckless disregard of the fact that force, threats of force, fraud, and coercion, as defined in 18 U.S.C. § 1591(e)(2), and any combination of such means, would be used to cause Victim #1 to engage in a commercial sex act, and that Victim #1 had not attained the age of 18 years and would be caused to engage in a commercial sex act.

```
          FILED
   CLERK, U.S. DISTRICT COURT

         JUN 21 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY
```

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>ROBERT J. FALCHE<br>OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>June 21, 2013 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Lane Dilg x3493  REC: Detention

**A F F I D A V I T**

I, Robert J. Falche, being duly sworn, do hereby depose and state:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") Human Smuggling and Trafficking Unit ("HSTU"), and I have been so employed since approximately November 2011.  During my training and experience as a SA, I have experience and have received instruction on writing search warrant affidavits and gathering information for the determination of probable cause.  I am currently assigned to investigate the sexual exploitation of minors in the Central District of California as part of the Southern California Innocence Lost ("SOCAIL") Task Force.  The SOCAIL Task Force is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 1591(a) et seq.  Previously, I was employed with the Brea Police Department as a Police Officer, the Tulare County Sheriff's Department as a Deputy Sheriff and the Torrance Police Department, as a Police Officer, between 1996 and 2002. From 2002 through November 2011, I was employed as a SA with the Department of Homeland Security Office of Inspector General.  As a Special Agent Trainee, I attended and completed twenty-two (22) weeks of the Criminal Investigator Training Program

1

("CITP") and the ICE Special Agent Training Program ("ICE-SAT")
at the Federal Law Enforcement Training Center ("FLETC") in
Glynco, Georgia.  I received training in immigration law, arrest
procedures, the execution of searches and seizures, and various
other U.S. federal criminal laws and legal procedures.  From
this training, I became familiar with the investigations of and
human smuggling and trafficking organizations.  I also became
familiar with criminals' methods of maintaining and operating a
criminal organization.

        2.    During my assignment as a Special Agent within the HSI
HSTU Long Beach Group, I participated with more senior Special
Agents and law enforcement officials in numerous investigations
involving human trafficking.  These investigations have taught
me the many techniques and tactics utilized by human traffickers
and their associates to avoid detection and/or apprehension by
law enforcement officials.  My duties included the investigation
of criminal organizations specifically formed for the purposes
of alien smuggling and/or sexual trafficking of unwilling or
unwitting victims.

        3.    I have debriefed numerous defendants, informants,
confidential sources, and witnesses who had personal knowledge
regarding trafficking organizations.  I have also participated
in various aspects of criminal investigations, including
conducting physical and electronic surveillance; utilizing

                                   2

informants and cooperating sources; seizing narcotics and weapons; executing search warrants; and making arrests. I have also participated in a subsidiary role in several investigations involving court-authorized interceptions of wire and electronic communications used to facilitate specified unlawful activities and conspiracies associated with criminal organizations.

4. I have participated and assisted in numerous investigations involving human smuggling, human trafficking, and human trafficking of minors. I am familiar with the methods employed by alien smugglers and traffickers, including the recruitment, distribution, housing and transportation of aliens, and the collection and concealment of proceeds of alien trafficking.

5. The statements contained in this affidavit are based upon my training and experience, information, including law enforcement reports, provided to me by other investigators, other law enforcement officers, and witnesses as part of this investigation. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and search warrant, I have not attempted to include each and every fact known to me or other law enforcement personnel concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

3

## II.   PURPOSE OF AFFIDAVIT

6.    This affidavit is made in support of a criminal
complaint and arrest warrant for RALPH ALLEN JACKSON JR., also
known as "Mac Wimp," ("JACKSON") for violations of 18 U.S.C. §
1591(a) (Sex Trafficking of Children and By Force, Fraud, and
Coercion).

7.    This affidavit is also made in support of a search
warrant authorizing the search of seven digital devices
specified below for evidence, contraband, fruits, or
instrumentalities of violations of 18 U.S.C. § 1591(a) (Sex
Trafficking of Children and By Force, Fraud, and Coercion).

## III. DIGITAL DEVICES TO BE SEARCHED

8.    The digital devices set forth in Attachments A-1, A-2,
A-3, A-4, A-5, and A-6, seized on or about June 18, 2013,
pursuant to a warrant issued by the Superior Court of
California, Los Angeles County, and currently stored in a
secured room at the Long Beach Police Department, 400 West
Broadway, Long Beach, California 90802 and are described as
follows (herein referred to collectively as "SUBJECT DEVICES"):

a.    Hewlett-Packard Model HP G60 Laptop, serial
number 2CE836DT62 ("SUBJECT DEVICE 1");

b.    Hewlett-Packard Model Pressario CQ60, serial
number 2CE9286RPY ("SUBJECT DEVICE 2");

4

c.   LG Model LGMN27 cellular phone, serial number 203CYYQ0451738 (SUBJECT DEVICE 3");

d.   Motorola Model Razor cellular phone, serial number F55GHYCS2 ("SUBJECT DEVICE 4");

e.   Apple Iphone Model A1303 cellular phone, unknown serial number ("SUBJECT DEVICE 5"); and

f.   LG Model VX8575 cellular phone, serial number 002KPZX0783541 ("SUBJECT DEVICE 6").

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Facts of the Investigation

9.   On June 18, 2013, I received a telephone call from Long Beach Police Department ("LBPD") Vice Sergeant Eric Hooker. Hooker informed me that LBPD patrol units had responded to 111 West 9th St. in Long Beach regarding a domestic disturbance. Upon arrival officers recovered a 17 year old victim of human trafficking (hereinafter referred to as "VICTIM #1"). VICTIM #1 was taken back to the police department to be further interviewed by LBPD Vice Investigators.

10.   LBPD Investigators and I conducted a recorded interview of VICTIM #1. VICTIM #1 informed us of the following:

a.   VICTIM #1 was attending a party at a residence in approximately March 2013 in the area of Lynwood, CA. At that time, she was approached by an adult female whom she later came

5

to know as JOYCE ("JOYCE").  JOYCE paid her numerous compliments

and eventually told her that she had a male friend named "RJ"

whom VICTIM #1 should meet.  VICTIM #1 agreed and gave JOYCE her

phone number.  VICTIM #1 was contacted that same evening by RJ

(later identified as JACKSON).  VICTIM #1 had numerous telephone

calls and text exchanges with JACKSON for an approximately two

month period.  During this time, VICTIM #1 came to know JACKSON

by his street nickname "Mac Wimp."  JACKSON and VICTIM #1 did

not actually meet face to face until approximately June 1, 2013.

At that time, JACKSON picked up VICTIM #1 and took her to dinner

at a restaurant.  JACKSON paid VICTIM #1 numerous compliments,

telling her she was cute and had a great body.  JACKSON also

asked her questions regarding her sexual history.  JACKSON at

one point asked VICTIM #1 how old she was.  VICTIM #1 told him

she was 17 years old and told him her 18th birthday was not

until 2014.  JACKSON told VICTIM #1 that they would keep that a

secret between the two of them.

        b.    Approximately a few days later, JACKSON again

took VICTIM #1 out to eat.  Following the meal, JACKSON drove

VICTIM #1 to the area of East Alondra Blvd and South Long Beach

Blvd in the City of Compton and stopped the vehicle.  This area

is a well-known "track" (term used to describe an area where the

business of prostitution is commonly acknowledged to be

conducted with initial interactions occurring on the street).

JACKSON asked VICTIM #1 if she loved him.  When VICTIM #1
replied that she did, JACKSON told her to get out of the car and
begin prostituting herself on the street.  VICTIM #1 felt she
had no choice but to do what JACKSON told her.  VICTIM #1 then
realized that JACKSON was in fact a "pimp" (term used to
describe a person who employs prostitutes).  From that point and
for approximately 2 weeks, VICTIM #1 had been forced to perform
commercial sex acts on approximately 50 different males.

      c.    Initially, VICTIM #1 was verbally told by JACKSON
what the "rules" for working as a prostitute were.  JACKSON told
her that violations of the rules would result in beatings.
Rules included no eating or drinking while working as a
prostitute on the streets, no bathroom breaks, no sitting, no
talking with other prostitutes and no smoking.  VICTIM #1 was
told she always had to answer her phone when JACKSON called her
or she would get a beating.  VICTIM #1 worked various "tracks"
over the course of approximately two weeks including E. Compton
Blvd. and Santa Fe Ave. in Compton and Pacific Coast Highway and
Harbor Blvd. in Long Beach.

      d.    JACKSON told VICTIM #1 what prices to charge for
various sexual acts.  Prices were $40.00 for oral sex, $60.00
for straight sex and $80.00 for anal sex.

      e.    JACKSON told VICTIM #1 that she had to earn a
minimum of $600.00 per day.  When VICTIM #1 was unable to make

7

that amount her punishment included having her hair pulled, or she was ordered to remain on her knees for approximately 2 hours repeating phrases such as: "I am your bitch." All the money VICTIM #1 earned as a prostitute was given to JACKSON.

      f.    VICTIM #1 was forced to work the streets approximately 12 hours each day typically between the hours of 10 am and 9pm. VICTIM #1 was only allowed one meal per day. VICTIM #1 was forced to work when sick. JACKSON was always present nearby in his vehicle, described as a black Buick Regal, when VICTIM #1 was working. JACKSON told VICTIM #1 to have the clients park their vehicles near his so he could keep watch while VICTIM #1 engaged in acts of prostitution in the clients' vehicles.

      g.    JACKSON would additionally use computer websites to advertise the sexual services of VICTIM #1. These sites included myredbook.com and backpage.com. VICTIM #1 recalled that on one occasion, JACKSON got a room at the Signal Hill Inn located at 3101 Pacific Coast Highway in Signal Hill, California for the purposes of VICTIM #1 performing in call sexual services. On another occasion, JACKSON obtained a room at the Alameda Hotel located at 1050 Alameda St. in Wilmington, California. VICTIM #1 said JACKSON took photographs of her to post with the electronic ads soliciting prostitution. These photographs were taken in JACKSON'S apartment (111 West 9th St.,

8

Long Beach), and had distinguishing backgrounds which could identify the locations where the photographs were taken as JACKSON'S apartment.

h.    VICTIM #1 said that on approximately June 14, 2013, JOYCE, who had been working as a prostitute for JACKSON, was arrested for outstanding warrants.  Since that arrest, JACKSON ordered VICTIM #1 to exchange the miscellaneous U.S. currency earned by VICTIM #1 and another adult prostitute, VICTIM #2, for 100 dollar bills, which is all he would carry. VICTIM #1 said she did this on two different occasions exchanging approximately $8,000.00 at two different banks.  As a result of the arrest of JOYCE, JACKSON told VICTIM #1 and VICTIM #2 that they would have to work more hours to cover for JOYCE'S absence.

i.    VICTIM #1 said that on approximately June 10, 2013, JACKSON brought her to a private residence and ordered her to get a tattoo which was a picture of a crown with the words "Mac Wimp's Bitch."  VICTIM #1 said she told JACKSON she did not want to get a tattoo and JACKSON told her she would get the tattoo or he would "fuck her up."  VICTIM #1 attempted to leave the private residence (located at 509 North Fairfax Ave. in Los Angeles) where the tattoo was being applied.  At that time, JACKSON slammed the door preventing her from leaving and pulled her hair.  JACKSON told VICTIM #1 to "get my shit done."  VICTIM

9

#1 felt her safety was being threatened and allowed the tattoo to be done on her upper chest area.  VICTIM #1 said that JOYCE also got a similar tattoo the same evening.  JACKSON paid for these tattoos using cash.

        j.    VICTIM #1 said that she had been working too many hours as a prostitute and was tired of it, so on June 16, 2013, she left JACKSON'S residence where she had been forced to stay and went to stay with a relative.  JACKSON attempted to call her numerous times but she did not answer.  VICTIM #1 said JACKSON eventually sent her texts threatening to hurt her family members in order to get her to return.  VICTIM #1 said she returned to JACKSON'S residence on June 18, 2013, to retrieve her property. JACKSON several times threatened to harm her and pulled her hair in order to convince her to continue prostituting.  This led to a physical altercation which prompted the original call to LBPD.

        11.    LBPD provided me with screenshots of text messages on VICTIM #1's phone.  I have reviewed these messages, which show that VICTIM #1 and JACKSON discussed money and "dates" (a term commonly used to describe acts of prostitution) on several occasions.  VICTIM #1 consistently refers to JACKSON as "Daddy" and JACKSON consistently refers to VICTIM #1 as "bitch."  In another message, JACKSON tells VICTIM #1: "Ur getin ur ink 2moro @4" apparently referring to a tattoo.  In addition, JACKSON, apparently believing VICTIM #1 stole money from him, lists

VICTIM #1's home address and threatens VICTIM #1 telling her "u wont look the same bitch" and further threatens to make VICTIM #1's mother and father give the money to him. JACKSON also states that he can't wait to find VICTIM #1 and that she will never work the "track" again.

12. I have been informed by LBPD that, on or about June 18, 2013, JACKSON was placed under arrest at his residence based on state charges of human trafficking / false imprisonment, in violation of California Penal Code 236.1(A), terrorist threats, in violation of California Penal Code 422, pimping, in violation of California Penal Code 266(H)(A), and pandering, in violation of California Penal Code 266(I)(A). I have been further informed by LBPD that a red cell phone (SUBJECT DEVICE #3) was located on the property north of JACKSON'S apartment. The north bedroom window screen of JACKSON'S residence was removed, which was in the same direction of where the cell phone was recovered. The cell phone was found approximately fifteen feet from JACKSON'S north bedroom.

13. LBPD has also informed me that on or about June 18, 2013, JACKSON was transported to a booking facility. LBPD has informed me that, after being advised of his Miranda rights, JACKSON stated that he was not a pimp, denied having sex with VICTIM #1, and stated that he believed VICTIM #1 was 18 years of age.

11

14. I have been further informed by LBPD that a search warrant was obtained at approximately 8:40 p.m. on June 18, 2013, in the Superior Court of California, County of Los Angeles, for JACKSON's residence (111 West 9th St., Long Beach) and his vehicle. On or about June 18, 2013, LBPD executed the search warrant. LBPD has informed me that SUBJECT DEVICE #1 was recovered from JACKSON's vehicle, SUBJECT DEVICE #2 from JACKSON's roommate's bedroom, SUBJECT DEVICE #4 from JACKSON's roommate's bedroom, SUBJECT DEVICE #5 from JACKSON's roommate's bedroom, and SUBJECT DEVICE #6 from a black leather jacket in JACKSON's closet.

15. On or about June 19, 2013, JACKSON was interviewed by LBPD investigators. LBPD has advised me that, after being advised of his Miranda rights, JACKSON admitted to knowing both VICTIM #1 and VICTIM #2 were prostitutes. He further admitted driving them to "tracks" and taking money from them. JACKSON denied knowing that VICTIM #1 was a minor and told investigators he believed she was 18 years old. JACKSON admitted that the cellular phone found on the roof belonged to him and claimed that text messages on that phone describing how much money VICTIM #1 and VICTIM #2 made from acts of prostitution were merely for the sake of informing him. JACKSON said that the money he had taken from VICTIM #1 and VICTIM #2 was only compensation for driving them around. JACKSON stated that

12

VICTIM #1 had her tattoo prior to their meeting and he was not present when it was applied. JACKSON denied using the moniker "Mac Wimp." JACKSON denied using the websites myredbook.com or backpage.com.

16. On or about June 18, 2013, VICTIM #2 was interviewed by LBPD in conjunction with HSI. LBPD has informed me that VICTIM #2 provided the following information: VICTIM #2 stated that she had been working as a prostitute for another pimp. VICTIM #2 was physically assaulted by this pimp while working a track in Compton. In the midst of the assault, JACKSON intervened and the pimp fled. VICTIM #2 continued to work independently for that night until she was approached by another prostitute who she later learned was "JOYCE." JOYCE told her that she knew a pimp that could help her out and VICTIM #2 agreed to meet the pimp. The following morning VICTIM #2 met with JOYCE and the pimp who ended up being JACKSON. JACKSON recognized VICTIM #2 from the prior evening and told her that they were meant to be together. JACKSON then told VICTIM #2 what the rules were going to be. VICTIM #2 had to make at least $250.00 per night. All money earned by VICTIM #2 from her prostitution would be turned over to JACKSON. VICTIM #2 was told to charge $40.00 for oral sex and $60.00 for straight sex. VICTIM #2 said she was forced to work as a prostitute for approximately one week straight only sleeping approximately nine

13

hours total during that time. VICTIM #2 believed that if she refused to work or tried to stop working for JACKSON of if she failed to make money for JACKSON, he would beat her up. VICTIM #2 said sometime during the approximately ten days she worked for JACKSON, she met VICTIM #1. VICTIM #2 said VICTIM #1 had a tattoo reading "Mac Wimp's Bitch" on her chest and that "Mac Wimp" was JACKSON'S nickname. VICTIM #2 was unaware of JACKSON having any legitimate job and believed he only made his money from women's acts of prostitution.

## B.  Training and Experience Regarding Sex Trafficking and Digital Devices

17.  Based on my training and experience, and information from other law enforcement personnel, I know the following regarding the practices and activities of persons engaged in violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children and By Force, Fraud, and Coercion) and related commercial sex offenses:

18.  I know from training and experience in human trafficking and prostitution crimes that those individuals who, through coercion, enticement, intimidation, or force, enlist other individuals to become prostitutes, and who profit from the prostitution of others, are called "pimps."

19.  Pimps frequently facilitate the prostitution by transporting the prostitutes to locations where the prostitution

14

occurs, such as motels/hotels.  The pimps, at times, transport
prostitutes across state lines for the purpose of prostitution.
Prostitutes and/or pimps often stay in motels/hotels for the
purposes of conducting pimping, pandering, and/or prostitution
activities when they travel or when they conduct prostitution
locally.  The pimps utilize the monies earned during acts of
prostitution to purchase food, lodging, clothing, and other
items.  Pimps sometimes maintain ledgers indicating monies
earned from pimping, pandering, or prostitution.  Many pimps
work with co-conspirators, who are referred to colloquially as
"pimp partners," and these co-conspirators may share the illicit
proceeds gained from acts of prostitution.

    20.  Pimps have embraced the Internet as a means of
advertising commercial sex services and communicating with
customers.  Because some cellular telephones, known as "smart
phones," provide high-speed access to the Internet as well as
photograph/video capabilities, pimps utilize their cellular
telephones for many of the same purposes for which they utilize
a computer, such as recruiting prostitutes on social networking
web sites, such as Facebook.com or Twitter.com; taking
photographs of their prostitute(s) for online prostitution
advertisements; uploading/posting prostitution advertisements on
the Internet; and taking photographs or videos to memorialize
sexual activity with their prostitute(s), among other purposes.

21. Certain web sites have been created to facilitate communication between pimps/prostitutes and their clients. A few of the more notable web sites relevant to prostitution include backpage.com, craigslist.com, myredbook.com, and cityvibe.com. These web sites allow pictures to be posted as part of advertisements. I have viewed prostitution advertisements on backpage.com, myredbook.com, and humaniplex.com. Subjects who utilize the Internet to post prostitution-related advertisements on web sites such as backpage.com, humaniplex.com, and myredbook.com often use photographs in the advertisements that show a nude or semi-nude prostitute.

22. Pimps and their prostitutes communicate with each other via cellular telephones about prostitution activity. Additionally, prostitutes communicate with each other through cellular telephones to discuss prostitution activities. Also, prostitutes utilize cellular telephones as a way to be contacted by or to make contact with their clients. Communication is made through telephone calls, text messages, Instant Messages or chats, and emails, among others. Pimps are known to have a high turnover rate of prostitutes and, generally, seek to increase the size of their "stable." Therefore, they commonly keep extra cellular telephones at the ready for newly recruited prostitutes.

23.   Pimps will utilize their cellular telephone or a computer to access the Internet and procure motel/hotel rooms in order to use the motel/hotel rooms as a venue for prostitution activity. Individuals who pimp minor prostitution victims also sometimes produce, collect, and/or possess digital images of those victims in the form of child pornography using digital devices.

24.   Pimps will also typically use laptop computers and other digital devices to access the internet to post advertisements on websites such as myredbook.com and backpage.com, to store photographs or videos of their "girls" for their own personal possession, and to post such photographs to the internet and to send such photographs to potential clients/customers.

## C. **Training and Experience Regarding Digital Devices**

25. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital

18

devices and software programs in use today that it takes time to
conduct a thorough search.   In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

      b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.   As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

      c.   A single laptop or cellular phone may contain
many gigabytes of storage.   A single megabyte of storage space
is the equivalent of 500 double-spaced pages of text.   A single
gigabyte of storage space, or 1,000 megabytes, is the equivalent
of 500,000 double-spaced pages of text.

      d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.
Electronic files saved to a hard drive can be stored for years
with little or no cost.   Even when such files have been deleted,

19

they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can

21

record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

      g.    Review of the SUBJECT DEVICES described in this affidavit will take time due to the number of digital devices, the need to search various programs and applications commonly

contained and used for communication on laptops and cellular phones, the need to review video and other lengthy files, and the need to protect data from destruction, alteration, or loss.

h.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### V.    CONCLUSION

26.    Based on all of the foregoing facts, and my training and experience, I submit that there is probable cause to believe (1) that JACKSON violated 18 U.S.C. § 1591(a) (Sex Trafficking of Children and By Force, Fraud, and Coercion) and that instrumentalities, evidence, contraband, and fruits of these offenses will be found within the SUBJECT DEVICES.

ROBERT J. FALCHE
Special Agent, Homeland Security
Investigations

Subscribed and sworn to before me
on this __21__ day of June, 2013.

THE HONORABLE ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE

23